Sarah Spinuzzi (Bar No. 305658)
Email: sarah@coastkeeper.org
Lauren Chase (Bar No. 324162)
Email: lauren@coastkeeper.org
ORANGE COUNTY COASTKEEPER
3151 Airway Avenue, Suite F-110
Costa Mesa, California 92626
Telephone: (714) 850-1965

*Attorneys for Plaintiff Orange County Coastkeeper*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ORANGE COUNTY COASTKEEPER, a California non-profit corporation;<br><br>              Plaintiff,<br>    v.<br><br>MICROMETALS INC., a California corporation;<br><br>              Defendant. | Civil Case No. 8:21-cv-676<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

Orange County Coastkeeper ("Plaintiff"), by and through counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.    Plaintiff brings this civil suit under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* (the "Clean Water Act" or the "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States). On February 11, 2021, Plaintiff issued a 60-day Notice of Violation and Intent To Sue letter (the "Notice Letter"), attached hereto as **Exhibit A** and incorporated by reference herein, to Micrometals Inc. ("Defendant" or "Micrometals"), as the owner and operator of the Facility (the "Owner" and/or "Operator"). The Notice Letter informed Defendant of the violations of California's General Permit for Discharges of

Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ, as amended by Order No. 2015-0122-DWQ, as subsequently amended by Order 20XX-XXXX-DWQ (effective July 1,2020*) (hereinafter, the "Storm Water Permit") and the Clean Water Act at the subject industrial facility located at 5615 E. La Palma, Anaheim, California 92807 (the "Facility"). The Notice Letter informed Defendant of Plaintiff's intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

2.      The Notice Letter was also sent to the Acting Attorney General of the United States Department of Justice ("USDOJ"), the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Regional Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board (the "State Board"), and the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region (the "Santa Ana Regional Board" or "Regional Board"), as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

3.      Sixty (60) days have passed since the Notice Letter was sent via certified mail to Defendant and the State and Federal agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA, USDOJ, nor the State of California have commenced or are diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

4.      Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

5.      Plaintiff seeks relief for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

///

## II.    **INTRODUCTION**

6.      This complaint seeks relief for the Defendant's unlawful discharges of pollutants into waters of the United States from its industrial operations at the Facility. Specifically, Defendant's discharges of pollutants from the Facility enter into the County of Orange and City of Anaheim storm drain system via the E. Richfield Storm Drain, which empties to the nearby Santa Ana River, which flows to the Pacific Ocean at Huntington Beach State Park (collectively referred to as the "Receiving Waters"), in violation of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act. These violations have been occurring since at least February 12, 2016 and are ongoing and continuous.

7.      With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility, pour into storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering marine and fresh surface waters each year. These surface waters, known as receiving waters, are ecologically sensitive areas. These waters are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, magnesium, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to surface waters such as the Receiving Waters.

///

///

Complaint                                          3                            Case No. 8:21-cv-676

**III.**     **PARTIES**

    **A. Orange County Coastkeeper.**

    8.     Orange County Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California. Orange County Coastkeeper's office is located at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626.

    9.     Orange County Coastkeeper has over 1,350 members who live and/or recreate in and around the Santa Ana River, Huntington Beach State Park, and the greater Santa Ana River Watershed. Orange County Coastkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of Orange County. To further these goals, Orange County Coastkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

    10.     Members of Orange County Coastkeeper live and own homes in the Santa Ana River Watershed and use and enjoy the waters to which the Facility discharges storm water, including the Santa Ana River and its terminus at the Pacific Ocean. Members of Orange County Coastkeeper use these waterways to participate in a variety of water sports and other activities including, but not limited to, fishing, swimming, boating, kayaking, bird watching, viewing wildlife, hiking, biking, surfing, wading, standup paddle boarding, walking, running, and engaging in scientific study, including monitoring, restoration, and research activities. The discharge of pollutants from the Facility impairs each of these uses.

    11.     Defendant's failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act including, but not limited to, discharges of polluted storm water from the Facility, failure to report such pollution, and failure to act in accordance with the Storm Water Permit to improve the quality of storm water discharges from the Facility, degrades water quality and harms aquatic life in the Santa Ana River and its tributaries, and impairs Orange County Coastkeeper members' use and enjoyment of those waters, giving Plaintiff standing on

behalf of its members.

12. The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous. Thus, the interests of Coastkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Storm Water Permit and the Clean Water Act. The relief sought herein will redress the harms to Plaintiff's members caused by Defendant's activities.

13. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

**B. The Owner and/or Operator of the Facility.**

14. Coastkeeper is informed and believes, and thereon alleges, that Micrometals Inc. is an active California corporation registered and authorized to do business in California.

15. Coastkeeper is informed and believes, and thereon alleges, that Richard Barden is the Chief Executive Officer and registered agent for service of process for Micrometals located at 5615 E. La Palma Ave., Anaheim, CA 92807.

16. Coastkeeper is informed and believes, and thereon alleges, that George Bradley is the Facility Contact identified by Micrometals in its Notice of Intent ("NOI") for coverage under the Storm Water Permit.

17. Micrometals, is the current owner and/or operator of the Facility, and has been the owner and/or operator of the Facility since at least 2010, and is the responsible party under the Clean Water Act.

**IV.     LEGAL BACKGROUND**

**A.     The Clean Water Act.**

18. Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit

1  issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

2  19.   The Clean Water Act requires point source discharges of pollutants to
3  navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. §
4  122.26(c)(1).

5  20.   The "discharge of a pollutant" means, among other things, "any addition of
6  any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40
7  C.F.R. § 122.2.

8  21.   The term "pollutant" includes "dredged spoil, solid waste… rock, sand, cellar
9  dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C.
10  § 1362(6); *see* 40 C.F.R. § 122.2.

11  22.   "Waters of the United States" are defined as "navigable waters," and "all
12  waters which are currently used, were used in the past, or may be susceptible to use in
13  interstate or foreign commerce, including waters which are subject to the ebb and flow of
14  the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

15  23.   The EPA promulgated regulations defining "waters of the United States." *See*
16  40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only
17  traditionally navigable waters, but also other waters, including waters tributary to
18  navigable waters, wetlands adjacent to navigable waters, and intermittent streams that
19  could affect interstate commerce. *Id.*

20  24.   The Clean Water Act confers jurisdiction over waters that are tributaries to
21  traditionally navigable waters where the water at issue has a significant nexus to the
22  navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River*
23  *Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

24  25.   A significant nexus is established if the "[receiving waters], either alone or
25  in combination with similarly situated lands in the region, significantly affect the
26  chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S.
27  at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

28  26.   A significant nexus is also established if waters that are tributary to navigable

waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

27.    Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

28.    Defendant is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

29.    An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. *See* 33 U.S.C. § 1365(a).

30.    Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $56,460 per day per violation for all violations that occurred after November 2, 2015 and were assessed on or after December 23, 2020. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

31.    Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys', experts', and consultants' fees.

**B.    California's Storm Water Permit.**

32.    Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

33.    Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial

storm water dischargers. *See id.*

34.     California is a state authorized by EPA to issue NPDES permits.

35.     In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

36.     The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to the Clean Water Act.

37.     The Storm Water Permit was issued on July 1, 2015 pursuant to Order No. 2014-0057-DWQ.

38.     On November 6, 2018, pursuant to Order No. 2015-0122-DWQ, the State Board amended the Storm Water Permit to incorporate Total Maximum Daily Load ("TMDL") implementation requirements for waterbodies subject to TMDLs with contributions from industrial dischargers.

39.     In order to discharge storm water to waters of the United States lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. Storm Water Permit Finding #12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* Storm Water Permit, Finding 17.

40.     Violations of the Storm Water Permit are violations of the Clean Water Act. *See* Storm Water Permit, Section XXI(A) (Duty to Comply).

41.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *See* Storm Water Permit, Discharge Prohibition III(B).

**C.     The Storm Water Permit's Effluent Limitations.**

42.     The Storm Water Permit Effluent Limitations require dischargers covered by

the Storm Water Permit to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform. *See* Storm Water Permit, Section V(A).

43.     Pursuant to the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); Storm Water Permit, Effluent Limitation V(A).

44.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"), which are, in part, incorporated into the Storm Water Permit via the Table 2 Numeric Action Levels ("NALs"). *See* Storm Water Permit, Monitoring, Sampling and Analysis, XI(B).

45.     The EPA Benchmarks provide an objective standard to determine whether a facility's BMPs are successfully developed and/or implemented and achieve compliance with BAT and BCT standards. Storm Water Permit, Effluent Limitation V(A); *See* EPA's NPDES MSGP Fact Sheet at 106; *see also*, 65 Federal Register 64839 (2000).

46.     The EPA Benchmarks for the following parameters are as follows: pH – 6.0 – 9.0 standard units ("s.u."); TSS – 100 mg/L; iron – 1.0 mg/L; nitrate plus nitrate as nitrogen ("N+N") – 0.68 mg/L; O&G – 15 mg/L; and aluminum – 0.75 mg/L. Additional EPA Benchmarks for heavy metals, which depend on the hardness of the receiving water, also apply to storm water discharges from the Facility.

47.     Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that BMPs that meet BAT for toxic pollutants

and/or BCT for conventional pollutants have not been developed and/or implemented at the facility. *Id*.

**D.    The Storm Water Permit's Receiving Water Limitations.**

48.    The CWA and the Storm Water Permit's Receiving Water Limitations prohibit storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable Water Quality Standards ("WQS"). 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§122.4(d), 122.4(i), 122.44(d); Storm Water Permit, Receiving Water Limitation VI(A).

49.    WQS establish the water quality goals for a water body. 40 C.F.R. §131.2.

50.    WQS are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

51.    Discharges above WQS cause and/or contribute to impairment of the beneficial uses of the waters that receive polluted discharges.

52.    The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan, called a basin plan, which contains WQS for water bodies within its geographical area.

53.    The Santa Ana Regional Board adopted the Basin Plan for the Santa Ana Region (the "Santa Ana Basin Plan" or the "Basin Plan"). The Santa Ana Basin Plan identifies the "Beneficial Uses" of water bodies in the Santa Ana Regional Board's region. The Basin Plan identifies the Beneficial Uses for the Santa Ana River Reaches 1 and 2 and the Tidal Prism of the Santa Ana River to collectively include agricultural supply (AGR); groundwater recharge (GWR); warm freshwater habitat (WARM); water contact recreation (REC1); non-contact water recreation (REC2); commercial and sportfishing (COMM); wildlife habitat (WILD); rare, threatened, or endangered species (RARE); spawning reproduction and development (SPWN); estuarine habitat (EST); and marine habitat (MAR). *See* Santa Ana Basin Plan at Table 3-1.

54.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

55.     According to the 2016 303(d) List of Impaired Water Bodies, Huntington Beach State Park is impaired for PCBs (Polychlorinated biphenyls). Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already-impaired surface waters and aquatic-dependent wildlife that depend on these waters.

56.     The Receiving Waters are ecologically sensitive areas, which provide an essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species, including rare and/or threatened aquatic species. Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special biological significance of the Receiving Waters. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to surface waters such as the Receiving Waters.

57.     Polluted discharges from industrial manufacturing facilities, such as the Facility, can contain pH-affecting substances; metals, such as iron, magnesium, and aluminum; toxic metals, such as lead, zinc, nickel, cadmium, chromium, copper, arsenic, and mercury; chemical oxygen demand ("COD"); biological oxygen demand ("BOD"); total suspended solids ("TSS"); total organic carbon ("TOC"); benzene; gasoline and diesel fuels; cyanide; ammonia-N; fuel additives; paint; coolants; antifreeze; Nitrate plus Nitrite ("N+N"); trash; indicator bacteria; and oil and grease ("O&G"). Discharges of polluted storm water to the Santa Ana River and the Pacific Ocean pose threats to the public, dramatically affect the use and enjoyment of the surrounding environment, and adversely affect the aquatic environment.

58.     Discharges of pollutants at levels above WQS, like those from the Facility, cause or contribute to the impairment of the Beneficial Uses of the Receiving Waters.

59.     WQS may be either numeric or narrative objectives. Applicable WQS include, among others, the water quality objectives in the Basin Plan, and the Criteria for Priority Toxic Pollutants in the State of California, 40 C.F.R. § 131.38 ("CTR").

60.     The Santa Ana Basin Plan provides that "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5 as a result of controllable water quality factors." *See* Santa Ana Basin Plan, 4-18.

61.     The Santa Ana Basin Plan also includes a narrative WQS that establishes a toxicity standard which states that "[t]he concentrations of toxic substances in the water column, sediments or biota shall not adversely affect beneficial uses." *See* Santa Ana Basin Plan, 4-20.

62.     Further, the Santa Ana Basin Plan states that "[t]oxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are harmful to human health." *See* Santa Ana Basin Plan 4-20.

63.     The CTR establishes numeric WQS to protect human health and the environment in the State of California. Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008        (April        2000),        available        at: http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

64.     The WQS for zinc in the CTR is 0.12 mg/L and for copper is 0.013 mg/L, assuming a water hardness calculation of 100 mg/L.

65.     The CTR numeric limits are expressed as dissolved metal concentrations.

66.     Discharges with pollutant levels that cause or contribute to an exceedance of the CTR criteria, the Basin Plan standards, and/or other applicable WQS in the Receiving Waters are violations of Receiving Water Limitation Section VI(A) of the Storm Water Permit.

67.     The Storm Water Permit's Receiving Water Limitations prohibit storm water

discharges from adversely impacting human health or the environment. *See* Storm Water Permit, Section VI(B).

68.   Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation Section VI(B) of the Storm Water Permit.

**E.    The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements.**

69.   Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") prior to conducting, and in order to continue, industrial activities. Storm Water Permit, Sections I(I) (Finding 54), X(B). The SWPPP must meet all of the requirements of the Storm Water Permit. Storm Water Permit, Sections X(A)-(H); See also Storm Water Permit, Appendix 1. The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G).

70.   The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. Storm Water Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. Storm Water Permit, Section I(D) (Finding 32), Section X(C).

71.   The SWPPP must include: a narrative description and summary of all industrial activity; potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location

where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and an identification and description of individuals and their current responsibilities for developing and implementing the SWPPP. Storm Water Permit, Section X.

72.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section X.

73.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. Storm Water Permit, Section X(A)-(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. Storm Water Permit, Section X(B) and XV.

74.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. Storm Water Permit, Sections I(J) (Finding 55), X(B)(1).

### F.     The Storm Water Permit's Monitoring Implementation Program Requirements.

75.     The Storm Water Permit requires permittees to develop and implement a storm water Monitoring Implementation Program ("MIP") and include it in the SWPPP prior to conducting, and in order to continue, industrial activities. Storm Water Permit,

Sections X(I) and XI.

76.     The Storm Water Permit requires facility owners and/or operators to develop and implement an adequate MIP that meets all of the requirements of the Storm Water Permit. Storm Water Permit Sections X(I) and XI(A)-XI(D).

77.     The objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge and to ensure compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* Storm Water Permit, Section XI.

78.     An adequate MIP ensures that BMPs are effectively reducing and/or eliminating pollutants at the facility, and is evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *See id*.

79.     The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the Storm Water Permit. Storm Water Permit, Section XI(B).

80.     Section XI(A)(1) of the Storm Water Permit requires dischargers to conduct monthly visual observations during dry weather of each drainage area. Monthly visual observations must include observations of any non-storm water discharges, all outdoor industrial equipment and activities, BMPs, and all potential sources of pollution.

81.     Section XI(A)(2) of the Storm Water Permit requires dischargers to conduct visual observations at the same time sampling occurs at a discharge location, and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, odor in the discharge, and the source of any pollutants in storm water discharges from the facility.

82.     Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* Storm Water Permit, Section XI(A)(3).

83.     The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at

the facility. Storm Water Permit, Section X(B)(1).

84.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. Storm Water Permit Section XI(B)(4).

85.     Section XI(B)(1) of the Storm Water Permit defines a Qualifying Storm Event ("QSE") as a precipitation event that produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area.

86.     The Storm Water Permit requires dischargers to collect and analyze storm water samples from at least two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30), which must be analyzed for TSS, pH, O&G and additional parameters identified on a facility-specific basis that serves as indicators of the presence of all industrial pollutants identified in the pollutant source assessment—in addition to those required under the Standard Industrial Classification ("SIC") code. Storm Water Permit, X(B)(3) and X(G)(2).

87.     Table 1 of the Storm Water Permit requires dischargers with SIC code 3499 (Fabricated Metal Products, Not Elsewhere Classified) to analyze samples for zinc, N+N, iron, and aluminum.

88.     Table 1 of the Storm Water Permit requires dischargers with SIC code 3479 (Coating, Engraving, and Allied Services, Not Elsewhere Classified) to analyze samples for zinc and N+N.

89.     Section XI(B)(6)(c) of the Storm Water Permit requires dischargers to analyze samples for pollutants associated with industrial operations.

90.     Section XI(B)(6)(f) of the Storm Water Permit requires dischargers to analyze additional parameters required by the Regional Board.

91.     Section XI(B)(6)(e) of the Storm Water Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to

1    receiving waters with 303(d) listed impairments, or approved TMDLs.

2        92.    Section XI(B)(11) of the Storm Water Permit, among other requirements,

3    provides that permittees must submit all sampling and analytical results for all samples

4    via Storm Water Multiple Application & Report Tracking System ("SMARTS") within

5    thirty (30) days of obtaining all results for each sampling event.

6        **G.    The Storm Water Permit's Exceedance Response Actions**

7             **Requirements.**

8        93.    Under the Storm Water Permit, facility operators are required to perform

9    Exceedance Response Actions ("ERA") as appropriate whenever sampling indicates NAL

10   exceedances.

11       94.    An annual NAL exceedance occurs when the average of all the analytical

12   results for a parameter from samples taken within a reporting year exceeds the annual

13   NAL value for that parameter.

14       95.    An instantaneous maximum NAL exceedance occurs when two (2) or more

15   analytical results from samples taken for any single parameter within a reporting year

16   exceed the instantaneous maximum NAL value or are outside of the instantaneous

17   maximum NAL range for pH. Storm Water Permit, Section XII(A).

18       96.    Upon receiving NOI coverage, all permittees are deemed in "Baseline

19   status." See Storm Water Permit, Section XII(B).

20       97.    A permittee's Baseline status for any given parameter changes to "Level 1

21   status" if sampling results indicate an NAL exceedance for that same parameter. *See* Storm

22   Water Permit, Section XII(C).

23       98.    Level 1 status commences on July 1 following the reporting year during

24   which the exceedance(s) occurred. Storm Water Permit, Section XII(C). By October 1

25   following commencement of Level 1 status, permittees are required to: complete an

26   evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"),

27   of the industrial pollutant sources at the facility that are or may be related to the NAL

28   exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and

any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of Storm Water Permit. *See* Storm Water Permit, Section XII(C)(1)(a)-(c).

99.    Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *See* Storm Water Permit, Section XII(C)(1)(c).

100.    Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 ERA Report prepared by a QISP that includes the a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See* Storm Water Permit, Section XII(C)(2)(a)(i)-(ii).

101.    The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *See* Storm Water Permit, Section XII(C)(2)(a)(iii).

102.    A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive QSEs that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. Storm Water Permit, Section XII(C)(2)(b).

103.    A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the discharger is in Level 1. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. Storm Water Permit, Section XII(D).

104.    A discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1

following the reporting year during with the NAL exceedances occurred. On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. Storm Water Permit, Section XII(D).

**H.    The Storm Water Permit's Annual Reporting Requirements.**

105.    Section XVI of the Storm Water Permit requires dischargers to submit an Annual Report to the Regional Board by July 15 of each year.

106.    The Annual Report must include a Compliance Checklist that indicates whether a discharger has complied with all of the requirements of the Storm Water Permit, an explanation for, an explanation for any non-compliance of requirements within the reporting year, an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation. *See* Storm Water Permit, Section XVI.

107.    Annual Reports are certified by the legally responsible person under penalty of perjury.

**V.    FACTUAL BACKGROUND**

**A.    The Facility's Storm Water Permit Coverage.**

108.    Plaintiff is informed and believes, and thereon alleges, that on or about June 18, 2015, Defendant obtained Storm Water Permit coverage for the Facility by submitting an NOI to the State Board.

109.    Plaintiff is informed and believes, and thereon alleges, the Facility's NOI identifies the operator of the Facility as "Micrometals Inc" with an address of 5615 E La Palma, Anaheim, California 92807.

110.    The NOI lists the Facility as 2.6 acres in size, with all 2.6 acres of industrial area exposed to storm water.

111.    The State Board's electronic SMARTS database, lists the current Facility Waste Discharge Identification ("WDID") number as 8 30I020475.

112.    SMARTS lists the Facility's coverage under the Storm Water Permit as

1    "Active."

2        113.   The NOI lists the SIC code for the Facility as 3679 (Electronic Components,

3    NEC).

4        114.   SIC code 3679 facilities must obtain Storm Water Permit coverage for the

5    entire facility. *See* Storm Water Permit, Section XVII.E.1.

6        115.   Plaintiff is informed and believes, and thereon alleges, that additional SIC

7    codes, including 3499 (Fabricated Metal Products, NEC) and/or 3479 (Coating, Engraving

8    and Allied Services, NEC), may also apply to the Facility.

9        **B.    Industrial Activities and Pollutant Sources at the Facility.**

10       116.   Plaintiff is informed and believes, and thereon alleges, that the Facility is an

11   iron powder core manufacturing facility that produces iron powder cores for the electronic

12   industry.

13       117.   Plaintiff is informed and believes, and thereon alleges, that the primary

14   industrial processes at the Facility include sifting, mixing, pressing, baking, tumbling,

15   painting, packing, and shipping iron powder cores.

16       118.   Plaintiff is informed and believes, and thereon alleges, that the industrial

17   activities at the Facility include, but are not limited to: manufacturing of iron powder

18   cores, storage of equipment, washing of equipment, shipping vehicle activity, welding,

19   and painting.

20       119.   Plaintiff is informed and believes, and thereon alleges, that areas of industrial

21   activity at the Facility include an industrial oven, welding areas, paint booths, storage

22   areas, and a truck well.

23       120.   The Facility's SWPPP sections entitled "List of Significant Materials" and

24   "Description of Potential Pollutant Sources" identifies potential pollutants sources

25   associated with the industrial activities at the Facility.

26       121.   Plaintiff is informed and believes, and thereon alleges that pollutants

27   associated with the areas of industrial activity and the industrial activities at the Facility

28   include, but are not limited to: pH-affecting substances, heavy metals including aluminum,

iron, zinc, and copper, N+N, spent abrasive grits, anti-corrosive compounds, paint, scrap metal, welding rods, PCBs, hydraulic fluids, flame retardants, lubricants, paints, dyes, sealants, trash, oil and grease, sediment and other suspended solids, and nutrients.

122.   Plaintiff is informed and believes, and thereon alleges, that pollutants have been and continue to be tracked throughout the Facility by vehicles and machinery, and that these pollutants are tracked outside of the Facility and accumulate on the driveway, sidewalk, and street outside of the Facility.

123.   Plaintiff is informed and believes, and thereon alleges, that industrial materials and equipment are stored outdoors without adequate cover or containment, resulting in discharges of polluted storm water.

124.   Plaintiff is informed and believes, and thereon alleges, that the storage and maintenance of vehicles and equipment and the storage of hazardous materials associated with industrial activities are stored outside without adequate cover to prevent storm water and non-storm water exposure to pollutant sources and without secondary containment or other adequate treatment measures to prevent polluted storm water and prohibited non-storm water discharges from discharging from the Facility, resulting in significant pollutant sources at the Facility.

125.   Plaintiff is informed and believes, and thereon alleges, the Facility's Owner and/or Operator has not properly developed and/or implemented the required BMPs to address the pollutant sources and associated pollutants at the Facility.

126.   Plaintiff is informed and believes, and thereon alleges, the Facility's Owner's and/or Operator's failure to develop and/or implement required BMPs results in the exposure of pollutants associated with their industrial activities to precipitation, and results in the Facility's discharge of polluted storm water from the Facility's washing area(s), welding and painting area(s), storage area(s), maintenance area(s), and other areas into the storm sewer system, which flows into the Receiving Waters in violation of the Storm Water Permit and the Clean Water Act.

127.   Plaintiff is informed and believes, and thereon alleges, that these illegal

discharges of polluted storm water negatively impact Plaintiff's members' use and enjoyment of the Receiving Waters by degrading the quality of the Receiving Waters and by posing risks to human health and aquatic life.

128.   Plaintiff is informed and believes, and thereon alleges, that the industrial activities and areas at the Facility include, but are not limited to, the activities and areas described in paragraphs 116-126.

129.   Plaintiff is informed and believes, and thereon alleges, that the industrial activities and areas of industrial activity are sources of pollutants at the Facility.

**C.   Defendant's Violations of the Storm Water Permit's Effluent Limitations.**

130.   Plaintiff is informed and believes, and thereon alleges, that BMPs that achieve BAT/BCT have not been implemented at the Facility.

131.   Plaintiff is informed and believes, and thereon alleges, that storm water discharges from the Facility contain concentrations of pollutants associated with the Facility's industrial activities above benchmark levels established by the EPA and incorporated into the Storm Water Permit.

132.   Plaintiff is informed and believes, and thereon alleges, storm water discharges from the Facility contain concentrations of pollutants with exceedances of NALs for iron, N+N, aluminum, zinc, and pH.

133.   Plaintiff is informed and believes, and thereon alleges, that the significant exceedances of NALs demonstrate that the Facility Owner and/or Operator has failed and continues to fail to develop and/or implement BMPs at the Facility as required to achieve compliance with the BAT/BCT standards in order to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water from the Facility.

134.   Plaintiff is informed and believes, and thereon alleges, that the Effluent Limitations of the Storm Water Permit are violated each time storm water discharges from the Facility.

///

**D.      Defendant's Violations of the Storm Water Permit's Receiving Water Limitations.**

135.   Plaintiff is informed and believes, and thereon alleges, that the Facility's discharges include concentrations of metals and other pollutants that cause exceedances of the Basin Plan's narrative WQS.

136.   Plaintiff is informed and believes, and thereon alleges, that storm water discharges from the Facility contain elevated concentrations of pollutants, which adversely impact human health and the environment.

137.   Plaintiff is informed and believes, and thereon alleges, that each time polluted storm water is discharged from the Facility, the Facility Owner and/or Operator violates the Basin Plan's narrative WQS.

138.   Plaintiff is informed and believes, and thereon alleges, that storm water samples collected by Plaintiff demonstrate that discharges from the Facility contain concentrations of zinc and copper that cause or contribute to a violation of an applicable WQS in the CTR.

139.   Plaintiff is informed and believes, and thereon alleges, that each time polluted storm water discharges from the Facility, Facility Owner and/or Operator violates the numeric WQS in the CTR and, by extension, the CWA.

140.   Plaintiff is informed and believes, and thereon alleges, that storm water samples collected by the Facility and by Plaintiff demonstrate that discharges from the Facility contain pH values that cause or contribute to a violation of an applicable WQS in the Basin Plan.

141.   Plaintiff is informed and believes, and thereon alleges, that each time polluted storm water discharges from the Facility, Facility Owner and/or Operator violates the numeric WQS in the Basin Plan and, by extension, the CWA.

142.   Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS, Defendant violates Receiving Water Limitation VI(A) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §

1311(a).

143.   Each time discharges from the Facility adversely impact human health or the environment is a separate and distinct violation of Receiving Water Limitation VI(B) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

**E.     The Discharges from the Facility to the Receiving Waters.**

144.   Plaintiff is informed and believes, and thereon alleges, that polluted storm water from the Facility discharges into the E. Richfield Storm Drain, which empties to the Santa Ana River, which flows to the Pacific Ocean at Huntington Beach State Park.

145.   Plaintiff is informed and believes, and thereon alleges, that each of the receiving waters described in paragraph 144 are waters of the United States.

**F.     Defendant's Violations of the Storm Water Permit's SWPPP Requirements.**

146.   The Facility's SWPPP is publicly available via the SMARTS database and is dated June 18, 2015, revised on January 27, 2017, and last revised on January 6, 2020.

147.   Plaintiff is informed and believes, and thereon alleges, that the SWPPP referenced in paragraph 146 is the current SWPPP for the Facility.

148.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to adequately develop, implement, and/or revise a SWPPP, in violation of SWPPP requirements of the Storm Water Permit.

149.   Plaintiff is informed and believes, and thereon alleges, that a site map ("Site Map") was uploaded to SMARTS on June 18, 2015, and that the Site Map is a map of the Facility submitted pursuant to Section II(B)(3)(a) of the Storm Water Permit.

150.   Plaintiff is informed and believes, and thereon alleges, that the SWPPP for the Facility fails to identify and describe all storm water discharge locations at the Facility.

151.   Plaintiff is informed and believes, and thereon alleges, that the Facility's Site Map depicts three discharge locations but the SWPPP only identifies two.

152.   Plaintiff is informed and believes, and thereon alleges, that the Facility's SWPPP fails to describe all discharge locations at the Facility as required by the Storm

Water Permit.

153.   Plaintiff is informed and believes, and thereon alleges, that the Site Map does not indicate storm water flow direction within the Facility.

154.   Plaintiff is informed and believes, and thereon alleges, that storm water sheet flows out of the driveways at the Facility, and the water then flows south into the municipal storm system and into the Receiving Waters.

155.   Plaintiff is informed and believes, and thereon alleges, that the Facility's Site Map is out of compliance with the Storm Water Permit by failing to identify (i) the Facility boundaries, (ii) on-site drainage areas, (iii) the direction of flow, (iv) nearby storm drain inlets, (v) nearby water bodies, (vi) areas of industrial activity, (vii) areas where materials are exposed, (viii) structural control measures, and (ix) other areas and items required by the Storm Water Permit. *See* Storm Water Permit, Section X(E).

156.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed to adequately revise the SWPPP in response to ongoing high concentrations of pollutants.

157.   Plaintiff is informed and believes, and thereon alleges, that the Facility's SWPPP erroneously states that the Facility must sample two storm events per reporting year, when, on the contrary, the Storm Water Permit requires samples from four Qualifying Storm Events. *Compare* SWPPP Section 5(a) *with* Storm Water Permit, Section XI(B)(2).

158.   Plaintiff is informed and believes, and thereon alleges, that the Facility's SWPPP does not adequately describe, at a minimum, its (i) pollution prevention team, (ii) dust and particulate generating activities, (iii) spilled/leaked materials throughout the past five years, (iv) industrial processes, (v) potential pollutant sources, (vi) BMPs, or (viii) employee training procedures in violation of the Storm Water Permit.

159.   Plaintiff is informed and believes, and thereon alleges, that the Facility's SWPPP's list of significant materials identifies pollutants such as nitrogen, nickel, and copper as present on-site, but fails to include those pollutants in its monitoring plan.

160.   Plaintiff is informed and believes, and thereon alleges, that the Facility's SWPPP's list of significant materials fails to include the typical quantity and handling frequency of each material as required by Section X(F) of the Storm Water Permit.

161.   Plaintiff is informed and believes, and thereon alleges, that the Facility's SWPPP fails to describe adequate BMPs to reduce or prevent pollutants in the discharges from the Facility.

162.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit's SWPPP requirements since at least February 13, 2016.

163.   Plaintiff is informed and believes, and thereon alleges, that each day the Facility has operated with an inadequately developed, implemented, and/or improperly revised SWPPP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act.

## G.   Defendant's Violations of the Storm Water Permit's Monitoring Implementation Plan Requirements.

164.   The Facility's SWPPP section entitled: "Monitoring Program and Reporting Requirements" discusses the Facility's MIP.

165.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has been conducting, and continues to conduct, operations at the Facility with an inadequately developed, implemented, and/or improperly revised MIP.

166.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to collect storm water discharge samples as required pursuant to Section XI(B)(3) of the Storm Water Permit, which requires dischargers to collect and analyze storm water samples from two QSEs within the first half of each reporting year and two QSEs within the second half of each reporting year.

167.   Plaintiff is informed and believes, and thereon alleges, that in each of the 2015-2016 and 2016-2017 reporting years, the Facility Owner and/or Operator collected

only two storm water samples.

168.   Plaintiff is informed and believes, and thereon alleges, that the samples in each of the 2015-2016 and 2016-2017 reporting years were collected from just two of the Facility's three discharge locations in violation of the Storm Water Permit. *See* Storm Water Permit, Section XI(B)(4).

169.   Plaintiff is informed and believes, and thereon alleges, that even though the Facility Owner and/or Operator did not sample the required amount of QSEs and did not sample from all discharge locations, the Facility's 2015-2016 Annual Report falsely certified that it sampled the required number of QSEs from all discharge locations. *See* 2015-2016 Annual Report, Question 3.

170.   Plaintiff is informed and believes, and thereon alleges, that in the 2017-2018 reporting year, the Facility Owner and/or Operator failed to adequately collect a single sample, claiming that one sample they collected was collected using incorrect sampling procedures and erroneously claiming that all other rain events occurred either outside operating hours or did not produce sufficient discharge. *See* 2017-2018 Annual Report.

171.   Plaintiff is informed and believes, and thereon alleges, that in the 2018-2019 reporting year, the Facility Owner and/or Operator collected only three storm water samples, erroneously claiming that all other rain events occurred outside operating hours or did not produce sufficient discharge. *See* 2018-2019 Annual Report.

172.   Plaintiff is informed and believes, and thereon alleges, that climatological data obtained from the National Oceanic and Atmospheric Administration ("NOAA") demonstrates that there were additional opportunities to sample significant rain events during each reporting year. *See* Ex 2 of Notice Letter

173.   Plaintiff is informed and believes, and thereon alleges, that as of the date of the Notice Letter to the Facility Owner and/or Operator, the Facility Owner and/or Operator had not uploaded a single sample from the current 2020-2021 reporting year.

174.   Plaintiff is informed and believes, and thereon alleges, that on March 5, 2021, following the date of the Notice Letter, the Facility Owner and/or Operator uploaded

sample results collected on January 29, 2021 to SMARTS with : (i) iron results of 1.2 mg/L (Sample ID WSW-1-29-21), 6.3 mg/L (Sample ID ESW-1-29-21), and 4.5 mg/L (Sample ID LD-1-29-21); and, (ii) pH results of 6.43 S.U. (Sample ID WSW 1-29-21), 6.48 S.U. (Sample ID ESW-1-29-21), and 6.59 S.U. (Sample ID LD-1-29-21).

175. Plaintiff is informed and believes, and thereon alleges, that on March 18, 2021, following the date of the Notice Letter, the Facility Owner and/or Operator uploaded sample results collected on March 3, 2021 to SMARTS with: (i) iron results of 4.9 mg/L (Sample ID ABC EAST SWAYLE 3_3_21), 3.5 mg/L (Sample ID ABC WEST SWAYLE 3_3_21), and 4.9 mg/L (Sample ID ABC LD SWAYLE 3_3_21); and, (ii) pH results of 6.20 S.U. (Sample ID ABC EAST SWAYLE 3_3_21), 6.39 S.U. (Sample ID ABC WEST SWAYLE 3_3_21), and 6.46 S.U. (Sample ID ABC LD SWAYLE 3_3_21).

176. Plaintiff is informed and believes, and thereon alleges, that in violation of Storm Water Permit Sections X(G)(2) and XI(B)(6)(c), the Facility Owner and/or Operator is not sampling for all pollutants present in its storm water discharge. *See* Ex 1 of Notice Letter.

177. Plaintiff is informed and believes, and thereon alleges, that additional SIC codes apply to the Facility, and, accordingly, the Facility Owner and/or Operator is not sampling for all pollutants required pursuant to Storm Water Permit, Section XI(B)(6)(d).

178. Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to conduct and record adequate visual observations of storm water discharges since Facility obtained permit coverage on or about June 18, 2015.

179. Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to conduct and record all required monthly visual observations at the Facility.

180. Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit's MIP requirements since at least February 12, 2016.

181.   Plaintiff is informed and believes, and thereon alleges, that the Defendant is in violation of the Storm Water Permit and the Clean Water Act because it has failed and continues to fail to adequately develop, implement, and/or revise an MIP, in violation of the Storm Water Permit's MIP requirements.

**H.    Defendant's Violations of the Storm Water Permit's Exceedance Response Requirements.**

182.   Plaintiff is informed and believes, and thereon alleges, that based on sample results submitted by the Facility Owner and/or Operator, the Facility triggered Level 1 status during the 2015-2016 reporting year for iron.

183.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator was required to (i) complete a Level 1 ERA Evaluation by October 1, 2016, (ii) prepare and submit a Level 1 ERA Report to SMARTS by January 1, 2017, and (iii) amend the SWPPP accordingly with revisions uploaded to SMARTS by January 1, 2017.

184.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to upload SWPPP revisions until January 30, 2017.

185.   Plaintiff is informed and believes, and thereon alleges, that the SWPPP revisions referenced in Paragraph 184 were submitted late and otherwise out of compliance with the Storm Water Permit.

186.   Plaintiff is informed and believes, and thereon alleges, that based on sample results submitted by the Facility Owner and/or Operator, the Facility triggered Level 2 status during the 2016-2017 reporting year for iron.

187.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator was required was required to (i) submit a Level 2 ERA Action Plan by January 1, 2018, (ii) submit a Level 2 ERA Technical Report by January 1, 2019, and (iii) amend the SWPPP accordingly.

188.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to submit its Level 2 ERA Action Plan until November 6,

2018 and its Level 2 ERA Technical Report until July 15, 2019. Plaintiff is informed and believes, and thereon alleges, that the submissions were over six (6) months late in both instances and otherwise out of compliance with the Storm Water Permit.

189.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to submit a single storm water sample from the 2017-2018 reporting year.

190.   Plaintiff is informed and believes, and thereon alleges, that during the 2018-2019 reporting year, the Facility continued to exceed NALs for iron and also exceeded the instantaneous NAL for pH, triggering Level 1 status for pH.

191.   Plaintiff is informed and believes, and thereon alleges, that the Facility exceeded NALs for both iron and pH during the 2019-2020 reporting year, which elevated the Facility's status to Level 2 for pH.

192.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to implement the BMPs described in its Level 2 ERA documents.

193.   Plaintiff is informed and believes, and thereon alleges, that storm water samples collected by Plaintiff indicate continued exceedances of pH and iron, as well as additional exceedances of N+N, aluminum, copper, and zinc. As a result, Plaintiff is informed and believes, and thereon alleges, that Facility Owner and/or Operator failed to comply with the Storm Water Permit's requirements to utilize an iterative process for determining and improving BMPs.

194.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to take Exceedance Response Actions as required by Storm Water Permit Section XII.

195.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit Exceedance Response Actions requirements since at least February 12, 2016.

196.   Plaintiff is informed and believes, and thereon alleges, that every day the

Facility operates without timely submitting and implementing all required Level 1 and Level 2 ERA reports is a separate and distinct violation of the Storm Water Permit and the Clean Water Act.

**I.    Defendant's Failure To Comply With The Storm Water Permit's Reporting Requirements.**

197.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to submit Annual Reports that comply with the Storm Water Permit's reporting requirements.

198.   Plaintiff is informed and believes, and thereon alleges, that the 2015-2016 Annual Report submitted by the Facility Owner and/or Operator falsely certifies that all required QSEs were sampled when, on the contrary, the Facility only reported two sampling events.

199.   Plaintiff is informed and believes, and thereon alleges, that the 2016-2017 Annual Report submitted by the Facility Owner and/or Operator erroneously certifies that the Facility was unable to sample the required number of QSEs because "[t]here was not another stormwater event where I could sample" [*sic*].

200.   Plaintiff is informed and believes, and thereon alleges, that the 2017-2018 Annual Report submitted by the Facility Owner and/or Operator erroneously attributes the lack of samples to "incorrect sampling procedures" during one rain event and all other events occurring outside operating hours or producing insufficient discharge.

201.   Plaintiff is informed and believes, and thereon alleges, the 2018-2019 Annual Report falsely states samples were only collected from one storm event during the first half of the reporting season because all other rains "occurred during non-operating hours" or "did not produce sufficient discharge for sample collection."

202.   Plaintiff is informed and believes, and thereon alleges, that based on climatological data obtained from NOAA, there were additional opportunities to sample significant rain events during each of the reporting years described in Paragraphs 199-201. *See* Ex 2 of Notice Letter.

203.   Plaintiff is informed and believes, and thereon alleges, that the Annual Reports for each year since 2015 falsely state that Micrometals (i) included the Identified Pollutants within the Impaired Watershed in the SWPPP's pollutant source assessment and (ii) conducted analytical monitoring for the Identified Pollutants.

204.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator falsely certified that none of the Identified Pollutants, which include pH, were present on-site in its 2015-2016 and 2016-2017 Annual Reports, which is directly contradicted by the Facility's 2015-2016 and 2016-2017 sample results.

205.   Plaintiff is informed and believes, and thereon alleges, that in the 2017-2018, 2018-2019, and 2019-2020 Annual Reports, the Facility Owner and/or Operator falsely certified that copper was not present on-site. This is directly contradicted by the list of significant materials included in the Facility's SWPPP and by Plaintiff's sampling results confirming the presence of copper and pH in concentrations exceeding NALs and/or applicable WQS. *See*, Ex. 1 of Notice Letter.

206.   Plaintiff is informed and believes, and thereon alleges, that despite these deficiencies, the Facility Owner and/or Operator falsely certified that all of the information submitted in the annual reports was true and correct.

207.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has submitted incomplete and/or incorrect Annual Reports that fail to comply with the Storm Water Permit, and as a result, the Facility Owner and/or Operator is in daily violation of the Storm Water Permit.

208.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit's reporting requirements every day since at least July 1, 2016.

209.   Plaintiff is informed and believes, and thereon alleges, that every day the Facility Owner and/or Operator conducts operations at the Facility without reporting as required by the Storm Water Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

# VI.     CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**Violation of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the Storm Water Permit's Effluent Limitations.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

210.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

211.   Plaintiff is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

212.   Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a daily violation of the Storm Water Permit and the CWA. Storm Water Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

213.   Defendant violated, violates and will continue to violate the Storm Water Permit Effluent Limitations each day that the Facility is not implementing BMPs that achieve BAT/BCT standards for discharges of pollutants to waters of the United States from the Facility.

214.   Plaintiff is informed and believes, and thereon alleges, that Defendant violated the Effluent Limitations of the Storm Water Permit and the Clean Water Act within the applicable statute of limitations, and such violations are ongoing and continuous.

215.   Plaintiff is informed and believes, and thereon alleges, that Defendant's acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

216.   Plaintiff alleges that its members have been harmed by Defendant's acts and

1  omissions described herein and have standing to bring this suit.

2     217.   Each and every violation of the Storm Water Permit Effluent Limitations is

3  a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

4     218.   By committing the acts and omissions alleged above, Defendant is subject to

5  an assessment of civil penalties for each and every violation of the CWA occurring from

6  February 12, 2016 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33

7  U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

8     219.   An action for injunctive relief is authorized by CWA Section 505(a),

9  33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

10 would irreparably harm Plaintiff and the citizens of the State of California, for which harm

11 Plaintiff has no plain, speedy, or adequate remedy at law.

12    220.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

13 an actual controversy exists as to the rights and other legal relations of the Parties.

14    WHEREFORE, Plaintiff prays for judgment against Defendant as set forth

15 hereafter.

16

17            **SECOND CAUSE OF ACTION**

18 **Defendant's Discharges of Contaminated Storm Water in Violation of Storm Water**

19 **Permit Receiving Water Limitations and the Clean Water Act.**

20       **33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

21    221.   Plaintiff incorporates the allegations contained in the above paragraphs as

22 though fully set forth herein.

23    222.   Plaintiff is informed and believes, and thereon alleges, within the applicable

24 statute of limitations, that discharges of storm water containing levels of pollutants that

25 adversely impact human health and/or the environment occur each time storm water

26 discharges from the Facility.

27    223.   Plaintiff is informed and believes, and thereon alleges that, within the

28 applicable statute of limitations, storm water containing levels of pollutants that cause or

contribute to exceedances of water quality standards has and continues to be discharged each time storm water discharges from the Facility.

224. Plaintiff is informed and believes, and thereon alleges, that Defendant's acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

225. Plaintiff alleges that its members have been harmed by Defendant's acts and omissions described herein and have standing to bring this suit.

226. Defendant violated, violates and will continue to violate the Storm Water Permit Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

227. Plaintiff is informed and believes, and thereon alleges, that Defendant has and continues to violate the Receiving Water Limitations of the Storm Water Permit and the CWA within the applicable statute of limitations, and that such violations are ongoing and continuous.

228. Each and every violation, within the applicable statute of limitations, of the Storm Water Permit Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

229. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 13, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

230. An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

231. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

1  an actual controversy exists as to the rights and other legal relations of the Parties.

2      WHEREFORE, Plaintiff prays for judgment against Defendant as set forth

3  hereafter.

4  ### THIRD CAUSE OF ACTION

5  **Defendant's Failure to Adequately Develop, Implement, and/or Revise a**

6  **Storm Water Pollution Prevention Plan in Violation of the Storm Water**

7  **Permit and the Clean Water Act.**

8  **33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

9      232.   Plaintiff incorporates the allegations contained in the above paragraphs as

10 though fully set forth herein.

11     233.   Plaintiff is informed and believes, and thereon alleges, within the applicable

12 statute of limitations, that Defendant has failed and continues to fail to develop an

13 adequate SWPPP for the Facility, in violation of the Storm Water Permit.

14     234.   Plaintiff is informed and believes, and thereon alleges, within the applicable

15 statute of limitations, that Defendant has failed and continues to fail to adequately

16 implement the SWPPP for the Facility, in violation of the Storm Water Permit.

17     235.   Plaintiff is informed and believes, and thereon alleges, within the applicable

18 statute of limitations, that Defendant has failed and continues to fail to adequately revise

19 the SWPPP for the Facility, in violation of the Storm Water Permit.

20     236.   Defendant has been in violation of the Storm Water Permit at the Facility

21 every day from February 13, 2016, to the present.

22     237.   Defendant's violations of the Storm Water Permit and the CWA at the

23 Facility are ongoing and continuous.

24     238.   Defendant will continue to be in violation of the Storm Water Permit and the

25 CWA each and every day Defendant fails to adequately develop, implement, and/or revise

26 the SWPPPs for the Facility.

27     239.   Plaintiff is informed and believes, and thereon alleges, that Defendant's acts

28 and omissions described herein constitute violations of individual terms of the Storm

---

1   Water Permit, compliance with which is required to lawfully discharge pollutants to
2   waters of the United States.

3       240.   Plaintiff alleges that its members have been harmed by Defendant's acts and
4   omissions described herein and have standing to bring this suit.

5       241.   Each and every violation of the Storm Water Permit SWPPP requirements at
6   the Facility is a separate and distinct violation of the CWA.

7       242.   By committing the acts and omissions alleged above, Defendant is subject to
8   an assessment of civil penalties for each and every violation of the CWA occurring from
9   February 13, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33
10  U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

11      243.   An action for injunctive relief under the CWA is authorized by Section 505(a)
12  of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions
13  alleged above would irreparably harm Plaintiff and the citizens of the State of California,
14  for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

15      244.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because
16  an actual controversy exists as to the rights and other legal relations of the Parties.

17      WHEREFORE, Plaintiff prays for judgment against the Defendant as set forth
18  hereafter.

19                          **FOURTH CAUSE OF ACTION**
20      **Defendant's Failure to Adequately Develop, Implement, and/or Revise a**
21      **Monitoring Implementation Program in Violation of the Storm Water**
22                      **Permit and the Clean Water Act.**
23              **33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

24      245.   Plaintiff incorporates the allegations contained in the above paragraphs as
25  though fully set forth herein.

26      246.   Plaintiff is informed and believes, and thereon alleges, within the applicable
27  statute of limitations, that Defendant has failed and continues to fail to develop an
28  adequate MIP for the Facility, in violation of the Storm Water Permit.

247.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendant has failed and continues to fail to adequately implement the MIP for the Facility, in violation of the Storm Water Permit.

248.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendant has failed and continues to fail to adequately revise the MIP for the Facility, in violation of the Storm Water Permit.

249.   Defendant has been in violation of the Storm Water Permit monitoring requirements at the Facility every day from February 12, 2016 to the present.

250.   Defendant's violations of the Storm Water Permit monitoring requirements and the CWA at the Facility are ongoing and continuous.

251.   The Facility Owner and/or Operator will continue to be in violation of Section XI of the Storm Water Permit and the CWA each and every day it fails to adequately develop, implement, and/or revise the MIP for the Facility.

252.   Plaintiff is informed and believes, and thereon alleges, that Defendant's acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

253.   Plaintiff alleges that its members have been harmed by Defendant's acts and omissions described herein and have standing to bring this suit.

254.   Each and every violation of the Storm Water Permit MIP requirements at the Facility is a separate and distinct violation of the CWA.

255.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 12, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

256.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California,

1   for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

2   257.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

3   an actual controversy exists as to the rights and other legal relations of the Parties.

4   WHEREFORE, Plaintiff prays for judgment against the Defendant as set forth

5   hereafter.

6   ## FIFTH CAUSE OF ACTION

7   **Defendant's Failure to Report as Required by the Storm Water Permit in**

8   **Violation of the Storm Water Permit and the Clean Water Act.**

9   **33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

10   258.   Plaintiff incorporates the allegations contained in the above paragraphs as

11   though fully set forth herein.

12   259.   Plaintiff is informed and believes, and thereon alleges, within the applicable

13   statute of limitations, that the Defendant's 2015-2016 Annual Report fails to meet the

14   requirements of Section XVI(B) of the Storm Water Permit.

15   260.   Plaintiff is informed and believes, and thereon alleges, within the applicable

16   statute of limitations, that the Defendant's 2016-2017 Annual Report fails to meet the

17   requirements of Section XVI(B) of the Storm Water Permit.

18   261.   Plaintiff is informed and believes, and thereon alleges, within the applicable

19   statute of limitations, that the Defendant's 2017-2018 Annual Report fails to meet the

20   requirements of Section XVI(B) of the Storm Water Permit.

21   262.   Plaintiff is informed and believes, and thereon alleges, within the applicable

22   statute of limitations, that the Defendant's 2018-2019 Annual Report fails to meet the

23   requirements of Section XVI(B) of the Storm Water Permit.

24   263.   Plaintiff is informed and believes, and thereon alleges, within the applicable

25   statute of limitations, that Defendant failed to submit a Level 1 ERA Report for iron in

26   accordance with Section XII(C) of the Storm Water Permit.

27   264.   Plaintiff is informed and believes, and thereon alleges, within the applicable

28   statute of limitations, that Defendant failed to submit a Level 2 ERA Action Plan for iron

in accordance with Section XII(D) of the Storm Water Permit.

265.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendant failed to submit a Level 2 ERA Technical Report for iron in accordance with Section XII(D) of the Storm Water Permit.

266.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendant failed to collect and report samples from all discharge locations in accordance with Section XI(B) of the Storm Water Permit since at least February 13, 2016.

267.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendant failed to report samples to SMARTS within thirty (30) days of receipt in accordance with Section XI(B) of the Storm Water Permit since at least February 12, 2016.

268.   Defendant has been in violation of Sections XI, XII, and XVI of the Storm Water Permit and the CWA every day since at least February 13, 2016.

269.   Plaintiff is informed and believes, and thereon alleges, that Defendant's acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

270.   Plaintiff alleges that its members have been harmed by Defendant's acts and omissions described herein and have standing to bring this suit.

271.   Defendant's violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

272.   By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 12, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

273.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions

alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

274.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays judgment against the Defendant as set forth hereafter.

## VII.   RELIEF REQUESTED

275.   Plaintiff respectfully requests that this Court grant the following relief:

a.   A Court order declaring the Defendant to have violated and in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include BAT/BCT requirements, for failing to meet receiving water limitations, for failing to develop and implement an adequate SWPPP, for failing to submit accurate annual reports, for failing to timely submit sufficient ERA reports, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit;

b.   A Court order enjoining Defendant from discharging pollutants in violation of an NPDES permit;

c.   A Court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act;

d.   A Court order assessing civil monetary penalties for each violation of the CWA at $56,460 per day per violation for all violations that occurred after November 2, 2015 and were assessed on or after December 23, 2020. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

e.   A Court order awarding Plaintiff its reasonable costs of suit, including attorneys', witness, experts', and consultants' fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

f.      Any other relief as this Court may deem appropriate.

Dated: April 13, 2021                        Respectfully submitted,


By _____
Sarah Spinuzzi
Attorney for Plaintiffs
Inland Empire Waterkeeper
Orange County Coastkeeper